IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CORRECTIONS U.S.A., | : | CIVIL ACTION NO. **1:CV-10-1497** |
| | : | |
| Plaintiff | : | Magistrate Judge Blewitt |
| | : | |
| v. | : | |
| | : | |
| DONALD McNANY, *et al.*, | : | |
| | : | |
| Defendants | : | |

**FILED**
**SCRANTON**

AUG 3 1 2012

PER _____
DEPUTY CLERK

**MEMORANDUM AND ORDER**

## I. BACKGROUND.

Plaintiff, Corrections U.S.A. ("CUSA"), filed this action on July 20, 2010, in the United States District Court for the Middle District of Pennsylvania, against the following Defendants: Donald McNany, individually and as President of Pennsylvania State Corrections Officers Association ("PSCOA"); Sam Brezler, individually and as Secretary/Treasurer of PSCOA; and John Miller, individually and as Business Agent of PSCOA. (Doc. 1, p. 1). Plaintiff filed its Complaint pursuant to this Court's diversity jurisdiction under 28 U.S.C. §1332 in that the parties are citizens of different states and the amount in controversy exceeds $75,000. (Doc. 1, p. 2). Plaintiff Corrections U.S.A. is a corporation formed under the laws of the State of California with a principal address in Auburn, California; Defendants are adult individuals and officials of PSCOA with a principal address in Harrisburg, Pennsylvania. (Doc. 1, pp. 2-3).

In its Preliminary Statement on page 1 of the Complaint, Plaintiff alleges that this action is for "interference with an existing contract and/or relationship and interference with prospective relations to redress the actions of the Defendants." (Doc. 1, p. 1).

As mentioned above, this Court has diversity jurisdiction over this case pursuant to 28 U.S.C. § 1332. Venue in the Middle District of Pennsylvania is proper pursuant to 28 U.S.C. § 1391(b). This case is governed by Pennsylvania contract and tort law. *See Acumed LLC v. Advanced Surgical Services, Inc.*, 561 F.3d 199, 212 (3d Cir. 2009).

On October 8, 2010, Defendants filed their Answer to the Complaint. (Doc. 10). In their Answer, Defendants admitted to Plaintiff's assertion of jurisdiction and venue. (Doc. 10, p. 1). The parties consented to proceed before a Magistrate Judge pursuant to 28 U.S.C. § 636(c), and on December 6, 2010, U.S. District Judge Caldwell transferred this case to the undersigned for all future proceedings. (Doc. 15).

On April 11, 2011, Defendants filed a Motion for Extension of Time to extend the discovery deadline thirty (30) days, and on April 13, 2011, the Court granted Defendants' Motion, extending the discovery deadline to May 11, 2011. (Docs. 16 & 17).

During discovery, Plaintiff did not serve Defendants with any interrogatories or requests for production or admissions and did not attempt to depose Defendants or any other individual. (Doc. 22, ¶ 46; Doc. 24, ¶ 46). On April 22, 2011, Defendants served Plaintiff with a Request for Production of Documents and Interrogatories, but Plaintiff never responded to the discovery requests. (Doc. 22, ¶¶ 47, 48; Doc. 24, ¶¶ 47, 48; Defs.' Ex. 16).

On May 31, 2011, Plaintiff filed a Motion for Extension of Time to Extend the Case Management Deadlines to which Defendants did not object. On June 1, 2011, the Court granted Plaintiff's Motion, extending the discovery deadline to July 31, 2011, and the dispositive motions deadline to September 30, 2011. (Docs. 18, 19).

2

On September 30, 2011, Defendants moved for summary judgment as to all claims and filed both a Brief in Support of their Motion and a Statement of Facts. (Docs. 20, 21, 22). Defendants also submitted sixteen exhibits in support of their Motion. (Doc. 20, Exs. 1-16). On October 20, 2011, Plaintiff filed a Brief in Opposition to Defendants' Motion for Summary Judgement, an Answer to Defendants' Statement of Facts, and an Affidavit in Opposition to Defendants' Motion for Summary Judgment. (Docs. 23, 24, 25).

Defendants' Motion for Summary Judgment is ripe for disposition.

## II. SUMMARY JUDGMENT STANDARD.

A motion for summary judgment may not be granted unless there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party may demonstrate that no genuine dispute as to any material fact exists by citing to pleadings, depositions, answers to interrogatories, admissions on file, and affidavits. Fed. R. Civ. P. 56(c). The court may consider any materials in the record in determining whether there exists a genuine issue of material fact. Fed. R. Civ. P. 56(c)(3). An issue of fact is "'genuine' only if a reasonable jury, considering the evidence presented, could find for the nonmoving party." *Childers v. Joseph*, 842 F.2d 689, 693-694 (3d Cir. 1988)(citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

The burden of proving lack of genuine issue of material fact initially falls upon the moving party. *Childers*, 842 at 694 (*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). The burden of proof shifts to the nonmoving party, however, when the moving party demonstrates no such genuine issue of fact. *Forms, Inc. v. American Standard, Inc.*, 546 F. Supp. 314, 321 (E.D. Pa. 1982),

*aff'd. mem.*, 725 F.2d 667 (3d Cir. 1983). The nonmoving party is required to go beyond the pleadings and by affidavits or by "depositions, answers to interrogatories and admissions on file" designate "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324.


In determining the existence of an issue of material fact, the court must consider the evidence in the light most favorable to the nonmoving party. *White v. Westinghouse Electric Company*, 862 F.2d 56, 59 (3d Cir. 1988). As such, the court must accept the nonmoving party's allegations as true and resolve any conflicts in his favor. *Id. (citing Gans v. Mundy*, 762 F.2d 338, 340 (3d Cir. 1985), *cert. denied*, 474 U.S. 1010 (1985); *Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir. 1976), *cert. denied*, 429 U.S. 1038 (1977)).

As stated, Pennsylvania contract and tort law is applicable to the claims raised in this case. *See Acumed*, 561 F.3d at 212.

## III. FACTUAL BACKGROUND.

Plaintiff CUSA was incorporated under the laws of California in 1998, and its principal address is in Auburn, California. (Doc. 1, ¶ 4; Doc. 22, ¶ 1; Doc. 24, ¶ 1). CUSA was formed by correctional officers to "provide national representation to correctional officers employed by federal, state and local governments" and receives monetary dues from its members on a monthly basis, collected through payroll deductions which are then forwarded to CUSA. (Doc. 22, ¶¶ 10-11; Doc. 24, ¶¶ 10-11). CUSA members receive benefits and services including, but not limited to: death benefits; comprehensive information about the correctional officer profession; assistance in fighting prison privatization; and lobbying on their behalf for various federal and state legislative

4

issues. (Doc. 25, ¶ 3). Some of the members of CUSA are also members of other associations (hereinafter referred to as "Dual Members"), including Defendant PSCOA. (Doc. 22, ¶ 12; Doc. 24, ¶ 12). Each month, the Commonwealth of Pennsylvania deducts CUSA's monthly dues from the paychecks of Dual Members who have provided written authorization for the Commonwealth to do so. (Doc. 22, ¶ 13; Doc. 24, ¶ 13; Doc. 25, ¶ 6). PSCOA then forwards those dues to CUSA, a procedure outlined in the collective bargaining agreement ("CBA") between PSCOA and the Commonwealth at Article 38, Section 2(b): "Effective April 1, 2006, the Employer will provide a payroll slot to the PSCOA to be used for a voluntary deduction program for membership in Corrections USA." (*Id.*; Doc. 25, ¶7;  Defs.' Ex. 4, p. 72). As of February 2009, 479 PSCOA members had authorized monthly dues for CUSA membership to be deducted from their paychecks. (Doc. 22, ¶ 17; Doc. 24, ¶ 17).

PSCOA is an unincorporated association with a principal address in Harrisburg, Pennsylvania. (Doc. 1, ¶¶ 5-7; Doc. 22, ¶ 2; Doc. 24, ¶ 2). Since 2001, the PSCOA has been the exclusive collective bargaining representative for all employees of the Commonwealth of Pennsylvania in the Department of Corrections and Department of Public Welfare ("Commonwealth") in the H-1 bargaining unit ("H-1"). (Doc. 22, ¶ 3; Doc. 24, ¶ 3; Defs.' Ex. 2, ¶ 3). Pursuant to the PSCOA's Constitution that internally governs the association, PSCOA is administered by a 13-member executive board ("Board" or "Executive Board"). (Doc. 22, ¶¶ 4-5; Doc. 24, ¶¶ 4-5; Defs.' Ex. 3, pp. 9-12). Since 2001, the PSCOA has been a party to a number of collective bargaining agreements with the Commonwealth regulating the terms and conditions of employment for approximately 11,000 employees in the H-1 bargaining unit, most recently one

with a term of July 1, 2008, to June 30, 2011. (Doc. 22, ¶ 6; Doc. 24, ¶ 6).

Defendant McNany was President of the PSCOA from August 2002 until July 2010. (Doc. 22, ¶ 7; Doc. 24, ¶ 7; Defs.' Ex. 2, ¶ 2). Defendant Brezler was the Secretary/Treasurer of the PSCOA from 2001 until July 2010. (Doc. 22, ¶ 8; Doc. 24, ¶ 8; Defs.' Ex. 7, ¶ 1). Defendant Miller was a Business Agent with the PSCOA from 2003 until July 2010. (Doc. 22, ¶ 9; Doc. 24, ¶ 9). Roy Pinto ("Pinto") was both a Regional Vice President with PSCOA from 2001 until July 2010 and Vice Chairman of CUSA from 2006 until the present, with CUSA compensating him in the amount of $1,000 per month. (Doc. 22, ¶ 16; Doc. 24, ¶ 16; Doc. 25, ¶¶ 15-16).

On February 5 and February 24, 2009, CUSA representative Robert Storm ("Storm"), who was also a PSCOA Executive Board member at the time, electronically transmitted *via* e-mail unencrypted files containing social security information of CUSA members to CUSA. (Doc. 22, ¶¶ 18-19; Doc. 24, ¶¶ 18-19). In a letter dated March 2, 2009, Defendant McNany notified the Dual Members of the breach and advised them on how to protect their identities. (Doc. 22, ¶ 20; Doc. 24, ¶ 20; Defs.' Ex. 5). On May 8, 2009, at a PSCOA Executive Board meeting, Executive Board member Don Kot raised the issue of whether PSCOA should continue its relationship with CUSA due to recent member dissatisfaction, and the Executive Board passed a motion to "terminate [its] organizational membership in CUSA." (Doc. 22, ¶¶ 21-22; Doc. 24, ¶¶ 21-22; Defs.' Ex. 6).

In May 2009, Pinto announced his campaign for the 2010 election of a new PSCOA President and, indicated that he would be forming a "slate of candidates to challenge the other incumbent officers." (Doc. 22, ¶ 23; Doc. 24, ¶ 23).

We note that the incidents which gave rise to Plaintiff's grievance against PSCOA

6

commenced in November of 2009, approximately six months after the PSCOA Executive Board voted to terminate its relationship with CUSA. We discuss these incidents chronologically and in greater detail below.

In early November 2009, Defendants maintain that PSCOA received a letter postmarked November 12, 2009, addressed simply to "Corrections USA" at the PSCOA address in Harrisburg, Pennsylvania. (Doc. 22, ¶ 24). Plaintiff admits this fact. (Doc. 24, ¶ 24).

In its Complaint, Plaintiff CUSA alleges that the envelope was addressed to Storm, CUSA's bookkeeper and a PSCOA Executive Board member. However, as stated, in its Response to Defendants' Statement of Facts, Plaintiff admits that the envelope was simply "addressed to Corrections U.S.A." (Doc. 1, ¶ 14; Doc. 24, ¶¶ 24-25). Defendant's Exhibit 8 is allegedly a photocopy of the envelope in question, and it is addressed to "CORRECTIONS U.S.A." at the PSCOA address in Harrisburg, as Defendants assert. (Defs.' Ex. 8).[1]

Upon receipt of the envelope postmarked November 12, 2009, Defendant Brezler, who was responsible for handling PSCOA's mail, opened the envelope, which contained a bank statement for CUSA. (Doc. 22, ¶ 25; Doc. 24, ¶ 25). Defendants maintain that Defendant Brezler opened this envelope "inadvertently" and, Plaintiff asserts that Brezler obtained and opened the envelope "without authorization" from CUSA. (Doc. 22, ¶ 25; Doc. 24, ¶ 25). After this incident, Defendant McNany sent a letter dated November 19, 2009, to CUSA Administrator Nina Salarno-Ashford ("Ashford") *via* certified mail which notified CUSA that the envelope was "opened inadvertently

---

[1]Defendants' Exhibit 8 is a photocopy of a Metro Bank envelope addressed solely to "CORRECTIONS USA." Though the date is faded, we can discern from the postmark that the letter was sent at some time in November.

by clerical error" and, that PSCOA voted to terminate its organizational membership with CUSA. (Doc. 22, ¶ 26; Doc. 24, ¶ 26). In the November 19, 2009 letter, Defendant McNany also explained that he had instructed Storm to remove the PSCOA address from all CUSA correspondence, but, because "that request went unheeded," McNany asked that Ashford immediately remove the address from "any and all CUSA documents" and that she "notify all businesses to cease and desist in sending CUSA mail" to PSCOA's address. (Doc. 22, ¶ 26; Doc. 24, ¶ 26; Defs.' Ex. 9).

On December 1, 2009, at a local union meeting in Huntingdon, Pennsylvania, local union president Jason Bloom ("Bloom"), who was known to support Pinto and eventually became a member of Pinto's slate of candidates, raised an issue about CUSA reflected in the following excerpt from that meeting's official minutes:

> A fellow H1 Member Joe Costanza passed away. The Union President, Don Mcnany [sic] cut ALL ties that PSCOA had with CUSA. PSCOA paid only $1.00/year per Member which gave each individual a $2,500.00 death benefit. The CUSA President James Baiardi called our Local President Jason Bloom and asked him where we would like the check sent for Costanza's family. That just goes to show that CUSA was NOT the ones who turned their backs on US, it was our very own President Mcnany [sic], after CUSA was one of the Founding Organizations that helped PSCOA get established. CUSA still had our backs after such a tragedy to one of our own.

(Doc. 22, ¶ 27; Doc. 24, ¶ 27; Defs.' Ex. 10, p. 11).

On December 30, 2009, Defendant McNany sent an e-mail to CUSA President James Baiardi ("Baiardi") informing him of the $45,000 in dues PSCOA paid to CUSA for the years 2007, 2008, and 2009, meaning that CUSA's benefit check to the Costanza family was a "[mere fulfillment of] its obligation to an organization member." (Doc. 22, ¶ 28; Doc. 24, ¶ 28; Defs.' Ex. 10). Defendant McNany requested that Baiardi provide proof, "via a notarized letter...and/or a copy

of the cancelled check," that CUSA paid the Costanza family their benefit. (*Id.*). Baiardi neither responded to Defendant McNany's email nor fulfilled McNany's request. (Doc. 22,  ¶ 29; Doc. 24, ¶ 29).

After the PSCOA Executive Board passed a resolution to terminate its organizational membership in CUSA in May 2009, CUSA's membership in Pennsylvania began to decrease. Individual PSCOA members paying dues to CUSA (collected through payroll deductions) dropped to 313 members (as compared to 479 Pennsylvania members in February of 2009). (Doc. 22, ¶ 30; Doc. 24, ¶ 30).

Defendants also maintain that, subsequent to PSCOA's termination of its organizational membership with CUSA, then-Vice President, and current PSCOA President, Roy Pinto, ceased going to the Commonwealth Academy ("Academy") to advertise the advantages of CUSA membership to incoming corrections officers and that he had not sent anyone to the Academy in his place. (Doc. 22, ¶ 31; Defs.' Ex. 2, ¶ 18; Defs.' Ex. 7, ¶ 16). Plaintiff CUSA and Pinto, however, specifically deny that Pinto stopped going to the Academy after PSCOA voted to end its organizational membership with CUSA. (Doc. 24, ¶ 31; Doc. 25, ¶ 18).

In a letter dated February 9, 2010,[2] Defendant McNany notified dual PSCOA -CUSA members that, as of December 2009, PSCOA had terminated its organizational membership with CUSA.  Defendant McNany stated that "CUSA's conduct was inconsistent with the goals and

---

[2]We briefly note that Defendant McNany's letter, transmitted on or about February 9, 2010, was erroneously dated February 9, 2009. We also note that Defendant McNany's letter made no mention of the prior security breach and did not evince any negative tone towards CUSA.

9

interests of [PSCOA's] membership." (Doc. 22, ¶ 32; Doc. 24, ¶ 32; Defs.' Ex. 11). Defendant McNany further provided information to the Dual Members on how to terminate their individual memberships with CUSA should they choose to do so and enclosed a form to that effect. (Doc. 22, ¶ 32; Doc. 24, ¶ 32; Defs.' Ex. 11). Plaintiff CUSA and Pinto assert that, although PSCOA's Executive Board voted to terminate its organizational membership with CUSA, Defendant McNany was not authorized to send the letter dated February 9, 2010, and that McNany did so in his individual capacity. (Doc. 24, ¶ 32; Doc. 25, ¶ 13).[3]

Although Defendant McNany sent the abovementioned letter, neither Defendants nor anyone else at PSCOA took steps to remove CUSA's payroll deduction slot for Pennsylvania corrections officers to continue their individual memberships with CUSA. (Doc. 22, ¶ 33; Doc. 24, ¶ 33; Doc. 20, Ex. 2, ¶ 20). In fact, the payroll deduction slot remained through the end of Defendant McNany's term as President of PSCOA in July 2010. (Doc. 22, ¶ 33; Doc. 24, ¶ 33; Doc. 20, Ex. 2, ¶ 20). Defendants submit that since September 13, 2010, the PSCOA website has advertised CUSA benefits for individual members and includes a link to apply for enrollment in

---

[3]Defendants have furnished a copy of the PSCOA Constitution (Doc. 20, Ex. 3), which describes in detail the responsibilities, duties and authority of the respective officers, including the President, Executive Vice President, Vice Presidents, the Secretary/Treasurer, as well as the Executive Board more broadly. We note that "The President shall be the principal executive and administrative officer of the Association." The Constitution also states that "[the President] shall exercise day-to-day supervision over the affairs of the Association, consistent with policies established by the Executive Board." We discuss whether the President was authorized to draft such a letter, i.e., Defendant McNany's letter dated February 9, 2010, in greater detail below.

CUSA. (Doc. 22, ¶ 34; Doc. 24, ¶ 34; Doc. 20, Ex. 2, ¶ 21 & Ex. 12).[4]

In the interim, both Defendant McNany's slate of candidates and Pinto's slate of candidates for PSCOA office began preparing and campaigning for the 2010 internal elections. (Doc. 22, ¶ 35; Doc. 24, ¶ 35; Doc. 20, Ex. 2, ¶ 22). During the contentious campaigns, Defendant Miller owned and operated a website entitled "voteno4pinto.com" ("the Website"). (Doc. 22, ¶ 36; Doc. 24, ¶ 36; Doc. 20, Ex. 2, ¶ 22). At some point after Defendant McNany sent out his February 9, 2010, letter but prior to the elections, the Website posted a message stating that Pinto was receiving $1,000 per month as compensation for his work with CUSA, which was relevant to McNany's campaign because, according to Defendants, Pinto had previously misled PSCOA members into thinking that he worked for CUSA on a voluntary basis. (Doc. 22, ¶ 37; Doc. 20, Ex. 2, ¶ 23 & Ex. 13). As proof, Defendant Miller also posted on the Website copies of six checks made out to Pinto from CUSA, indicating Pinto's monthly compensation. (Doc. 22, ¶ 38; Doc. 24, ¶ 38; Doc. 20, Ex. 2, ¶ 24 & Ex. 14). Defendants maintain that the copies of the posted checks were not contained in the envelope inadvertently opened by Defendant Brezler in November 2009, but were obtained by Defendant McNany from a California corrections officer with ties to CUSA. (Doc. 22, ¶ 40; Doc. 20, Ex. 2, ¶ 24). Plaintiff CUSA and Pinto specifically deny, however, that Pinto ever

_____

[4]Upon our review of the PSCOA website in August 2012, we note that Corrections USA is listed under the category of "Other Links" on the right side of CUSA's main page. The PSCOA's treatment of CUSA on its website is entirely neutral- though PSCOA does not in any way endorse CUSA, the mere placement of the link on the page suggests that PSCOA wants its members to at least be able to easily locate information on CUSA should they so desire. The link enables interested PSCOA members to go directly to the CUSA website, where prospective CUSA members can click on the "Membership page" and receive information as well as easily download an application to join CUSA.

misrepresented any of the work he performed for CUSA or PSCOA and, they allege that the copies of the checks in question were contained in the envelope opened by Defendant Brezler.[5] (Doc. 24, ¶'s 37 & 40; Doc. 25, ¶'s 9 & 19). Defendants maintain that nothing on the Website ever specifically addressed or disparaged CUSA or asked anyone to resign their CUSA memberships. (Doc. 22, ¶ 39; Doc. 20, Ex. 2, ¶ 25). Plaintiff CUSA asserts, however, that the Website is disparaging in nature and specifically denies that the Website did not disparage CUSA. (Doc. 24, ¶ 39).

In June of 2010, PSCOA held its internal elections, and Pinto and other members of his slate of candidates were declared victorious for their positions. (Doc. 22, ¶ 41; Doc. 24, ¶ 41; Doc. 20, Ex. 2, ¶ 26). On July 20, 2010, the same day Plaintiff filed this instant lawsuit, Pinto was sworn into office as the new President of PSCOA. (Doc. 22, ¶ 42; Doc. 24, ¶ 42; Doc. 20, Ex. 2, ¶ 27).

On or about August 9, 2010, the remainder of Pinto's slate of candidates was sworn into office, after which PSCOA retained the firm Lightman, Welby Stoltenberg & Caputo, the same firm that filed this action on behalf of Plaintiff, to represent it. (Doc. 22, ¶ 45; Doc. 24, ¶ 45; Doc. 20, Ex. 2, ¶ 29).

In giving Plaintiff every favorable inference that can be drawn from the record and the undisputed evidence, we find that there is no genuine issue of material fact with respect to its claims raised in the Complaint. We acknowledge there are certainly disputed facts, but find that

---

[5]We note that the envelope sent to CORRECTIONS USA in November 2009, which Defendant Brezler opened, was from Metro Bank in Harrisburg, Pennsylvania. The checks addressed to Roy Pinto, though, were from Commerce Bank, also in Harrisburg, PA. Prior to June 2009, the two banks were separate companies. However, the 33 Commerce Bank locations in the Harrisburg region became Metro Bank locations starting in June 2009.

under the evidence presented, Plaintiff has failed to establish its Pennsylvania state law claims

against Defendants. Therefore, we will grant Defendants' Summary Judgment Motion. *See Sharrar*

*v. Felsing*, 128 F.3d 810, 817 (3d Cir. 1997)(citing Fed. R. Civ. P. 56; *Hamilton v. Leavy,* 117 F.3d

742, 746 (3d Cir. 1997)).

## IV. DISCUSSION.

   *A. Defendants' Summary Judgment Motion, Doc. 20*

On September 30, 2011, Defendants McNany, Brezler, and Miller moved for summary

judgment against Plaintiff CUSA pursuant to Rule 56 of the Federal Rules of Civil Procedure. (Doc.

20).  In their Brief in Support of their Motion for Summary Judgment, Defendants present two main

arguments: (1) Plaintiff cannot state a cause of action against Defendants because Defendants were

acting as officers of PSCOA, a party to the alleged contractual agreement between Plaintiff and

individual corrections officers; and   (2) Even if PSCOA was not a party to the contractual

arrangement, Defendants did not tortiously interfere with existing contractual or business relations

or with prospective business relations between Plaintiff and individual corrections officers. (Doc.

21, p. 2). We will address each of Defendants' arguments in turn.

   *1. Plaintiff Has Not Established a Cause of Action Against Defendants*
   *Because Defendants Were Acting as Officers of PSCOA, a Party to the*
   *Alleged Contractual Agreement Between Plaintiff and Individual*
   *Corrections Officers*

As stated, since this Court has jurisdiction over this case based on diversity, we apply

Pennsylvania state law on substantive legal issues. *Kernaghan v. BCI Communications, Inc.*, 802

F.Supp. 2d 590, 595 (E.D. Pa. 2011)(citations omitted).  Pennsylvania has adopted the Restatement

(Second) of Torts §766, with respect to a tortious interference claim. *Id.* (citations omitted).

13

Restatement (Second) of Torts §766 provides:

> One who intentionally and improperly interferes with the performance of
> a contract (except a contract to marry) between another and a third party
> by inducing or otherwise causing the third person not to perform the contract,
> is subject to liability to the other for the pecuniary loss resulting to the other from
> the failure of the third person to perform the contract.

Thus, the *Kernaghan* Court, 802 F.Supp. 2d at 596, quoting *CGB Occupational Therapy, Inc.*

*RHA Health Servs, Inc.*, 357 F.3d 375, 398 (3d Cir. 2004), stated that the following elements must

be met for a tortious interference claim under Pennsylvania law:

> (1) the existence of a contractual, or prospective contractual relation between
> the complainant and a third party; (2) purposeful action on the part of the
> defendant, specifically intended to harm the existing relation, or to prevent a
> prospective relation from occurring; (3) the absence of privilege or justification
> on the part of the defendant; and (4) the occasioning of actual legal damage
> as a result of the defendant's conduct.

The *Kernaghan* Court, 802 F.Supp. 2d at 596, also stated, "[e]ssential to a right of recovery ...

is the existence of a contractual relationship between the Plaintiff and a 'third person' other than the

Defendant." (quoting *Rimbach*, 519 A.2d [997] at 1000 [(Pa. Super. 1987)]. *See also Motise v.*

*Parrish*, 297 Fed.Appx. 149, 152 (3d Cir. 2008)("[A] party to the contract, may not tortiously interfere

with the contract.")). Also, the *Kernaghan* Court pointed out that "State and federal court applying

Pennsylvania law on tortious interference have acknowledged that a tortious interference claim cannot

be asserted against a party to the contract." *Id.*(citations omitted).

14

We first note that it is unclear whether PSCOA was or is actually a party to any past or present agreements between Plaintiff and the individual corrections officers. (*See* Doc. 20, Ex. 12, p. 2). Defendants' Statement of Material Facts asserts that, since 2001, PSCOA has been party to a series of collective bargaining agreements, which govern the terms and conditions of employment for its members, with the Commonwealth. (Doc. 22, p. 2, ¶ 6). Plaintiff admits this fact. (Doc. 24, ¶ 6). Plaintiff alleges, though, that PSCOA is not a party to the alleged contractual relationship, and that there is a separate, independent contractual relationship that exists between Plaintiff CUSA and individual corrections officers who are dual CUSA-PSCOA members. (Doc. 23, p. 5). Plaintiff contends that it is the contractual relationship that exists between it and individual corrections officers which is at issue in this case. While  we discuss the merits of the arguments below, we ultimately conclude that even if PSCOA was not a party to the agreements, Plaintiff has not sufficiently shown interference with a business, contractual or prospective business relationship to preclude granting Defendants' Motion for Summary Judgment.

Defendants argue that right to recovery under Plaintiff's theory as an "action for interference with an existing contract and/or relationship and interference with prospective relations" requires a contractual relationship between Plaintiff and a party other than PSCOA. (Doc. 21, p. 5) (citing *Killian v. McCulloch*, 850 F. Supp. 1239, 1251 (E.D. Pa. 1994); *Nix v. Temple University*, 596 A.2d 1132, 1137 (Pa. Super. Ct. 1991)).  Defendants maintain that because a corporation cannot tortiously interfere with a contract to which it is a party and because PSCOA acts through its agents and officers, Defendants cannot be considered third parties to the agreements in question. (Doc. 21, pp. 5-6) (citing *Nix*, 596 A.2d at 1137).  Defendants assert that the actions complained of by Plaintiff were those of

PSCOA, since no named Defendant made the motion or the ultimate decision to end PSCOA's organizational membership with Plaintiff CUSA. (Doc. 21, pp. 6-7). Rather, the motion to terminate the membership was made by an Executive Board member and the final decision to terminate the membership was made by the Executive Board. Thus, Defendants maintain that "the record shows that it was PSCOA, through its agents, that took the actions complained of in this matter" and, that "for all intents and purposes, it is the PSCOA, and not the named individuals, who are the Defendants in this matter." (Doc. 21, p. 7) (citing *Nix, supra*; *Avins,* [610 F. Supp. 308, 318 (E.D. Pa. 1984)]).

In furtherance of this argument, Defendants submit that Plaintiff named the three Defendants both in their individual capacities and in their capacities as officers of PSCOA ("e.g., 'DONALD McNANY, individually and as President of Pennsylvania State Corrections Officers Association,' etc.") and that the Complaint specifically refers to Defendants in their roles as officers of PSCOA. (Doc. 21, p. 6). Defendants additionally note that Plaintiff selectively named the three Defendants and evaded naming PSCOA as a defendant so as to not target "an organization with which it is now again allied, and an officer – current President Pinto – who has been its staunchest supporter." (Doc. 21, p. 7, n.1).

Defendants further argue that PSCOA is a party to the "alleged contractual relationship" because Plaintiff cannot establish that CUSA enjoys a direct contractual relationship with individual corrections officers in Pennsylvania, but, rather, "the relationship is governed, in no small part, by the collective bargaining agreement ('CBA') between PSCOA and the employer of the individual corrections officers, and the Commonwealth," which mandates that the Commonwealth provides to the PSCOA a payroll slot for CUSA membership deductions. (Doc. 21, pp. 7-8).

16

Defendants conclude this argument by asserting again that PSCOA is a party to the alleged contractual relationships – both current and prospective – and, as such, cannot be held liable for wrongful interference with these relationships. (Doc. 21, p. 8) (citing *Abel v. American Art Analog, Inc.,* 838 F.2d 691, 698 (3d Cir. 1988); *Michelson v. Exxon Research and Eng'g Co.,* 808 F.2d 1005, 1007-1008 (3d Cir. 1987)).[6] As stated above, under Pennsylvania law "a tortious interference claim cannot be asserted against a party to the contract." *Kernaghan* , 802 F.Supp. 2d at 596.

On October 20, 2011, Plaintiff filed a Brief in Opposition to Defendants' Motion for Summary Judgment. (Doc. 23). Plaintiff argues as follows: "In this matter, Plaintiff does complain about a contract between itself and PSCOA. It is the relationship between the individual corrections officers and Corrections U.S.A. [CUSA] which is at issue." (*Id.* at 5). Plaintiff asserts that it entered into agreements with the individual corrections officers that were "separate and apart" from its agreement with PSCOA. (*Id.*).

Plaintiff seeks to rebut Defendants' argument that McNany, Brezler and Miller were acting as agents of PSCOA in the relevant incidents by arguing that each of these individuals did not act in their official capacity as PSCOA officials, but rather acted independently. Plaintiff argues that Defendant McNany was not authorized to send his February 9, 2010, letter "urging various correctional officers to cease their individual membership in Corrections U.S.A." (*Id.* at pp. 5-6). Plaintiff also maintains that

_____

[6]We acknowledge a footnote in Defendants' brief (Doc. 21, p. 8, n. 2) which states that "Indeed, PSCOA's *own insurance carrier* believes that PSCOA is the true Defendant here, as it has provided insurance coverage in this case. ([Doc. 22] SMF ¶44). Plaintiff admitted this fact. (Doc. 24, ¶ 44). Defendants also enclose ULLICO Casualty's coverage letter dated October 19, 2010, regarding this case, which states that ULLICO shall provide coverage for reasonable and necessary claims expenses to *"Defendants in their capacity as Officers of the [PSCOA]."* (emphasis added). (Doc. 20, Ex. 15, p. 1).

no evidence leads to either the conclusion that PSCOA directed or authorized Defendant Brezler to open the envelope at issue in November of 2009, and that there is no evidence to support the conclusion that PSCOA directed or authorized Defendant Miller to post copies of CUSA's checks written out to Pinto on the Website. (*Id.* at 6). In support of these assertions, Plaintiff submits the Affidavit of Roy Pinto (Doc. 25), in which Pinto avers that Defendants McNany, Brezler, and Miller all took their respective actions at issue without authorization. (Doc. 23, pp. 6-7; Doc. 25, ¶¶ 8, 9, 13).

As indicated above, we agree with Defendants that under Pennsylvania law, a party to a contract cannot be held liable for inference with that contract because the tort is defined as "'inducing or otherwise causing a *third person* not to perform a contract with another...without a privilege to do so.'" *National Data Payment Sys., Inc. v. Meridian Bank*, 212 F.3d 849, 856 (emphasis added) (quoting *Glazer v. Chandler*, 200 A.2d 416, 418 (Pa. 1964)). *See also Abel v. American Art Analog, Inc.*, 838 F.2d 691, 698 (3d Cir. 1988); *Michelson v. Exxon Research and Eng'g Co.*, 808 F.2d 1005, 1007-1008 (3d Cir. 1987) (quoting *Glazer*, 200 A.2d at 418); *American Food and Vending Corp. v. Full Serv. Vending Comp.*, 2011 WL 2632798 (M.D. Pa. 2011); *Kernaghan*, 802 F.Supp. 2d at 596.

We also agree with Defendants' assertion that, because corporations act through their agents and officers, such agents and officers are not considered third parties to contracts of which their corporation is a party when they are acting in their official capacities. *Wagner v. Tuscarora School Dist.*, Civ. No. 1:04-CV-1133, 2006 WL 167731, at *13 (M.D. Pa. Jan. 20, 2006) (citing *Nix v. Temple Univ.*, 596 A.2d 1132, 1137 (Pa. Super. Ct. 1991); *Avins v. Moll*, 610 F. Supp. 308, 318 (E.D. Pa. 1984)). *See also Belas v. Juniata Cnty. Sch. Dist.*, No. 1: CV-04-505, 2005 WL 2100666, at *12 (M.D. Pa. Aug. 26, 2005). There is an exception to this rule if the officer's or agent's sole motive in interfering is actual

18

malice toward the plaintiff or if it is against his organization's interest; however, an allegedly improper motive does not necessarily take an officer's or agent's actions out of the scope of his employment. *Wagner*, 2006 WL 167731, at *13 (citing *Killian v. McCulloch*, 850 F. Supp. 1239, 1252 (E.D. Pa. 1994); *Avins*, 610 F. Supp. at 318; *Emerson Radio Corp. v. Orion Sales*, 253 F.3d 159, 173-174 (3d Cir. 2001)). *See also Belas*, 2005 WL 2100666, at *12.

We find the Defendants' argument that they were acting within the scope of their employment because Plaintiff sued them in their official capacities to be largely  irrelevant. While it is true that Plaintiff did name Defendants both individually and as officers of PSCOA, this fact is not determinative. The relevant inquiry to establish whether Defendants were acting within their official capacities requires determining whether the actions complained of fall within the scope of Defendants' employment.

Pennsylvania has adopted the standard for determining whether conduct is within the scope of one's employment from the *Restatement (Second) of Agency*, which states that certain conduct is within that scope if: "'(a) it is the kind [the employee] is employed to perform; (b) it occurs substantially within the authorized time and space limits [and] (c) it is actuated, at least in part, by a purpose to serve the master...'" *Sharratt v. Murtha*, 437 Fed.Appx. 167, 172 (3d Cir. 2011) (citing *Brumfield v. Sanders*, 232 F.3d 376, 380 (3d Cir. 2000)) (quoting RESTATEMENT (SECOND) OF AGENCY § 228 (1958)).  Further, the Third Circuit has held when interpreting Pennsylvania law that "'the mere existence of a personal motivation is insufficient to relieve the employer from liability where the conduct also benefitted him and was within the scope of employment generally.'" *CNA v. U.S.*, 535 F.3d 132, 147 (3d Cir. 2008) (citing *Eisenberg v. Gagnon*, 766 F.2d 770, 783 (3d Cir. 1985)) (quoting

RESTATEMENT (SECOND) OF AGENCY § 228 (1958)).

In applying this standard to the Defendants' conduct, which included opening the letter addressed to CUSA, allegedly posting the checks on the internet and, sending a letter to CUSA-PSCOA members advising them of the discontinuation of the CUSA-PSCOA organizational relationship, we find that while Defendants McNany and Brezler were acting within the scope of their employment, there exists a genuine dispute as to whether Defendant Miller was similarly acting within the scope of his employment when he collected and allegedly posted checks on the internet showing payment from CUSA to Roy Pinto. Nonetheless, as we will also discuss, we do not conclude that this dispute constitutes a genuine dispute of material fact which would preclude entry of summary judgment for Defendants.

According to PSCOA's Constitution, the President is the "principal executive and administrative officer" and is charged with enforcing "the policies established by the Executive Board." The PSCOA Constitution also states that the President "shall exercise day-to-day supervision over the affairs of the Association, consistent with policies established by the Executive Board." (Doc. 20, Ex. 3, p. 4). When Defendant McNany sent his February 9, 2010 letter to PSCOA members notifying them of the Executive Board's decision to withdraw its organizational membership, it is readily apparent that he was fulfilling his duty as the chief executive and administrative officer of the PSCOA to inform Dual Members of an important change in policy put in place by the Board, as well as alert Dual Members to the possibility of retaining their membership in CUSA. Although McNany's letter was not explicitly authorized by the PSCOA Board, we find that it was implicitly authorized in that the PSCOA President's "interpretation and construction of the [PSCOA's] Constitution shall be accepted and shall

20

be binding upon all parties...pending approval or change of such interpretation or construction of the Constitution by the Executive Board." (Doc. 20, Ex. 3, p. 6).  Sending written communication to members to advise of an important organizational policy change, duly approved by the PSCOA Executive Board, appears to fall clearly within the PSCOA President's scope of employment and authority. Thus, we find that Defendant McNany February 9, 2010 letter:  (a) constitutes the type of work the PSCOA President was intended to perform; (b) falls substantially and clearly within the "authorized" time and space limit of the President's employment; and (c) helps actuate, at least in part, the PSCOA Executive Board's new policy. See Sharratt, 437 Fed.Appx. at 172.  We find that there exists no genuine dispute of material fact as to whether Defendnat McNany acted within the scope of his employment when he sent this communication to PSCOA-CUSA dual members.

We next proceed to address Defendant Brezler's actions, which consisted of opening U.S. mail addressed to CUSA and allegedly disseminating checks, found in that mail, to Defendant Miller. Given Defendant Brezler's authorization to open PSCOA's mail, there is little doubt Brezler was acting within the scope of his employment as Secretary/Treasurer of PSCOA when he, either purposefully or inadvertently, opened an envelope mailed to PSCOA's office in Harrisburg, Pennsylvania, addressed to "CORRECTIONS USA," at the proper PSCOA address. It is entirely reasonable, and it should be expected, that Defendant Brezler would have opened this mail based upon the existing relationship between the two organizations and the fact that the letter was sent to the PSCOA mailing address.

We note that the parties also dispute the contents of the envelope and whether Defendant Brezler provided its contents to Defendant Miller. (See Doc. 20, Ex. 8; Doc. 22, ¶¶ 39, 40; Doc. 24, ¶¶ 39, 40).  Given the contentious election campaign, it is conceivable that high-ranking PSCOA

21

officials would, in the scope of their employment, seek to influence the upcoming election by, perhaps, posting incriminating information about a political opponent, which could certainly fall within the scope of employment. Plaintiff vehemently insists, though, that the Secretary/Treasurer would not be expected to remove confidential mail contents and disseminate them to another individual. *See Sharratt*, 437 Fed.Appx. at 172.

We conclude, though, even when examining the evidence presented in the light most favorable to the Plaintiff as we must do with respect to Defendants' Motion for Summary Judgment, the factual dispute over whether the Defendants' conduct falls within the scope of Defendant Brezler's and Defendant Miller's employment does not preclude entry of summary judgment. As we discuss below, we find that none of the Defendants' actions, even if they occurred outside the scope of their employment, actually interfered with any contractual or business relationship, which is fatal to Plaintiff's tortious interference claim. The law is well-settled that disputes of incidental, non-material facts do not automatically preclude entry of summary judgment on an otherwise properly filed Motion for Summary Judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).

In finding that Defendant McNany was acting in his official capacity when he sent his letter dated February 9, 2010, we must also determine whether PSCOA, and thus Defendant McNany, was a party to the alleged contractual or business relationships between CUSA and the individual corrections officers to establish whether Plaintiff can state a claim of third party interference against McNany. *See National Data*, 212 F.3d at 856; *Wagner*, 2006 WL 167731, at *13. The evidence presented is inconclusive on this point. We find that Plaintiff cannot demonstrate precisely how PSCOA is not a party to the contractual or business relationships between CUSA and the individual

22

corrections officers. CUSA, in fact, relies upon the organizational power of the PSCOA to solicit potential memberships, benefits from a clear and simple method for enabling corrections officers wishing to pursue membership in CUSA to do so easily, and derives advantage from PSCOA's influence. Defendants have highlighted a conspicuous lack of evidence in support of Plaintiff's claim, as it is clear that the PSCOA, and its negotiating support on behalf of individual officers, form an integral part of any agreement between corrections officers and the Commonwealth through the CBA.[7]

We find the most similar role to the one PSCOA maintains between CUSA and the individual corrections officers in Pennsylvania to be that of a broker or a finder. The Superior Court of Pennsylvania has held that a finder is one who "merely introduces the parties and supplies information," while a broker is the "procuring cause of a ready, willing and able buyer who purchases on the terms and at the price designated by the principal." *Amerofina, Inc. v. U.S. Industries, Inc.*, 335 A.2d 448, 453 (Pa. Super. Ct. 1975).

We find, however, that it is unnecessary to make a determination on whether PSCOA was a party to any agreement between Plaintiff and individual corrections officers. We conclude that because Plaintiff cannot prove a claim of third party interference against any of the Defendants, even under the assumption the PSCOA is not a party to the relationships, the Defendants are entitled to summary judgment. Specifically, as we address below, we note a conspicuous absence of any harm specifically directed at Plaintiff, as well as an absence of damages sustained by Plaintiff which was caused by Defendants.

---

[7] We additionally note that neither Plaintiff nor Defendants presented case law regarding PSCOA's status in the contractual and business relationships in question.

> *2. Even if PSCOA was not a party to the alleged contractual relationship,*
> *Defendants did not ever tortiously interfere with existing or prospective*
> *relations between Plaintiff and individual corrections officers.*

Defendants divide this argument into three sub-arguments, addressing: (a) whether Defendants interfered with an existing contractual relationship between CUSA and individual corrections officers; (b) whether Defendants interfered with an existing business relationship between CUSA and individual corrections officers; and (c) whether Defendants interfered with any prospective business relationship between CUSA and individual corrections officers. (Doc. 21). We agree with Defendants' argument that neither the opening of the letter, posting of bank documents on the internet, nor the transmission of Defendant McNany's letter constitute interference with either existing contractual relationships between CUSA and individual corrections officers, or with existing or prospective business relationships between CUSA and individual corrections officers.

*1. Tortious interference with a contractual relationship claim*

Initially, Defendants (Doc. 21, p. 9) correctly lay out the elements of a claim for tortious interference with a contractual relationship in Pennsylvania from *Triffin v. Janssen*, 626 A.2d 571, 574 (Pa. Super. Ct. 1993):

1) the existence of a contractual relationship;

2) an intent on the part of the defendant to harm the plaintiff by interfering with that contractual relationship;

3) the absence of a privilege or justification for such interference; and

4) damages resulting from the defendant's conduct."

24

Specifically with regard to the third element of interference with a contractual relationship, Defendants assert that whether a defendant has privilege or justification for an alleged interference is determined by the "'rules of the game,' or the area of socially acceptable conduct which the law regards as privileged." (Doc. 21, p. 9) (citing *Barmasters Bartending School, Inc. v. Authentic Bartending School, Inc.*, 931 F. Supp. 377, 386 (E.D. Pa. 1996)). Defendants further submit six factors, drawn from *Phillips v. Selig*, 157 F. Supp. 2d 419, 426-427 (E.D. Pa. 2001), for the Court to consider in evaluating whether a particular course of conduct lacked privilege or justification:

1) the nature of the actor's conduct;

2) actor's motive;

3) interests of the other with which the actor's conduct interferes;

4) the interests sought to be advanced by the actor;

5) the proximity or remoteness of the actor's conduct to the interference; and

6) the relations between the parties.

*Brooks v. Systems Mfg. Corp.*, No. Civ.A.03-1523, 2003 WL 23023836, at *5 (E.D. Pa. Dec. 18,2003) (emphasis omitted) (quoting *Phillips v. Selig*, 157 F. Supp. 2d 419, 427 (E.D. Pa. 2001) (citing Restatement (Second) of Torts § 767 (1982)); *Triffin*, 626 A.2d at 574; *Adler*, 393 A.2d at 1184.

There is no dispute that there existed contractual relationships between Plaintiff CUSA and individual PSCOA members; thus, the first element of Plaintiff's interference with an existing contractual relationship claim is satisfied. *See Acumed*, 561 F.3d at 212. The second element of a prima facie case of tortious interference requires that the defendant acted with the "specific purpose" of causing the plaintiff harm. *Phillips,* 959 A.2d at 429 (quoting *Glenn*, 272 A.2d at 899). Pennsylvania

courts have held that this tort "'is an intentional one: the actor is acting as he does [f]or the purpose of causing harm to the plaintiff.'" *Phillips*, 959 A.2d at 429 (quoting *Glenn*, 272 A.2d at 899).

The Pennsylvania Supreme Court has held the second and third elements of a tortious interference claim are intertwined: "'[t]he absence of privilege or justification in the tort under discussion is closely related to the element of intent.'" *Hopkins v. GNC Franchising, Inc.*, 288 Fed.Appx. 871, 873-874 (3d Cir. 2008)(quoting *Adler, Barish, Daniels, Levin and Creskoff v. Epstein*, 393 A.2d 1175, 1183 (Pa. 1978)). For a claim of interference with an existing contractual relationship, Pennsylvania has adopted the formulation under the Restatement (Second) of Torts, which emphasizes whether the conduct at issue was "proper" under the specific circumstances, rather than whether it was "privileged." *Hopkins*, 288 Fed.Appx. at 874 (citing *Adler*, 393 A.2d at 1184 n. 17). *See also Windsor Sec., Inc. v. Hartford Life Ins. Co.*, 986 F.2d 655, 660 (3d Cir. 1993); *Phillips*, 959 A.2d at 429.

In examining these factors, the Pennsylvania Supreme Court has held that "when the purpose of the defendant's conduct is, in whole or in part, to protect a legitimate right or interest that conflicts with the interests of the plaintiff, 'a line must be drawn and the interest evaluated.'" *Phillips*, 959 A.2d at 430 (quoting *Glenn*, 272 A.2d at 899). These kinds of claims should undergo an analysis focused on whether the action(s) in question were appropriate under the circumstances:

> Although this evaluation of interests is not always susceptible of "precise definition," it is clear that the central inquiry is whether the defendant's conduct is "sanctioned by the 'rules of the game' which society has adopted." [*Glenn*, 272 A.2d at 899]; *Triffin*, 626 A.2d at 575 (refusal to consent to withdrawal of opposing party's attorney was not improper because conduct was consistent with the rules of court); [*Small v. Juniata College*, 682 A.2d 350, 354 (Pa. Super. Ct. 1996), appeal denied, 689 A.2d 235 (Pa. 1997)] (players on football team did not act improperly by voicing negative opinions of coach to college administration, which, upon investigation, discharged him, since in the academic world students are encouraged to voice their opinions).

*Phillips*, 959 A.2d at 430.

Under the fourth element, a plaintiff claiming interference with an existing contractual relationship in Pennsylvania must demonstrate "'lost pecuniary benefits flowing from the contract itself; other losses, such as emotional distress and loss of reputation, are consequential harms.'" *Shiner v. Moriarty*, 706 A.2d 1228, 1238 (Pa. Super. Ct. 1998), re-argument denied, (Pa. 1998). Lost profits stemming from a breach or interference with a contract are recoverable if: "(1) 'there is...evidence to establish the damages with reasonable certainty;' (2) the damages 'were the proximate cause of the wrong;' and (3) the damages 'were reasonably foreseeable.'" *Brisbin v. Superior Valve Co.*, 398 F.3d 279, 289 (3d Cir. 2005) (quoting *Advent Sys. Ltd. v. Unisys Corp.*, 925 F.2d 670, 680 (3d Cir. 1991). These lost profits "'cannot be recovered when they are merely speculative.'" *Brisbin*, 398 F.3d at 289 (quoting *Delahanty v. First Pa. Bank, N.A.*, 464 A.2d 1243, 1258 (Pa. Super. Ct. 1983)). Although the alleged damages need not be exact, the evidence presented should establish them "'with a fair degree of probability.'" *Brisbin*, 398 F.3d at 289 (quoting *Exton Drive-In, Inc. v. Home Indemnity Co.*, 261 A.2d 319, 324 (Pa. 1969)).

Defendants argue it is "apparent" that Defendants Miller and Brezler did "absolutely nothing" to interfere with the alleged relationship between Plaintiff and its members or prospective members. (Doc. 21, p. 9). The Defendants further state that Defendant Brezler's only act at issue was an inadvertent opening of a letter addressed to Plaintiff CUSA, which was immediately corrected and brought to Plaintiff's attention. (*Id.* at pp. 9-10). Defendants submit that even if the checks posted on the Website by Defendant Miller were contained in the envelope opened by Brezler, this posting was

27

a criticism of Pinto, an upcoming opponent in a contentious election campaign, not an attack on Plaintiff. (*Id.* at p. 10). Thus, the Defendants maintain that the only real inquiry at issue is whether Defendant McNany's "wholly authorized actions" as acting President of PSCOA in sending out his February 9, 2010 letter breach a privilege by jeopardizing CUSA's ability to take full advantage of prospective PSCOA members in its organization. (*Id.*). Based on the undisputed evidence detailed above, we agree entirely with Defendants that Miller's and Brezler's actions did not interfere with the relationship between Plaintiff and its members or prospective members.   We also  agree with Defendants that the crux of Plaintiff's interference with a contractual relationship is really levied only against Defendant McNany, and thus proceed to address solely whether McNany's February 9, 2010 letter breached a privilege which specifically targeted, and caused damage to, Plaintiff.

Defendants argue that the record shows  McNany's February 9, 2010 letter did not breach a privilege because it was "founded on serious dissatisfaction on the part of PSCOA with CUSA" in that Plaintiff CUSA was responsible for a breach in members' social security information in February 2005, had not made any attempt to contact members in over year, and did very little to help PSCOA in its fight against privatization. (Doc. 21, p. 10). As a result, PSCOA's Executive Board terminated its organizational membership with CUSA, a decision communicated by Defendant McNany to CUSA-PSCOA dual members in the letter at issue. (*Id.*). Defendants maintain that the February 9, 2010 letter was not an attack but, rather, served as a notification on how to cease contributing monthly payroll deductions to CUSA, and a "calm statement of reasons" why PSCOA terminated its organizational membership. (*Id.* at p. 11). Defendants add that they made "no attempt" to remove the payroll slot for such deductions from the Commonwealth paychecks and that CUSA membership forms are still

28

featured on PSCOA's website. (*Id.*). Thus, Defendants state that McNany's conduct was both privileged and justified, and was an attempt to protect the legitimate interests of PSCOA. (*Id.*) (citing *University Graphics v. Pro-Image Corp.*, 913 F. Supp. 338, 345 (M.D. Pa. 1996)).  We concur with Defendants.

We find that there is no genuine dispute of material fact with regard to Defendant McNany's conduct and that Defendants are thus entitled to judgment as a matter of law with regard to Plaintiff's tortious interference with existing contractual relationships claim.  Defendant McNany's February 9, 2010 letter to members stated:  "**Your continued contribution to CUSA does provide you with some minor benefits. Thus, notwithstanding PSCOA's decision to terminate its relationship with CUSA, you may wish to continue to make that contribution**."  (Doc. 20,   Ex. 11)(emphasis added). Referring to the elements required to show breach of privilege, the nature of such a characterization by Defendant McNany of the benefits as "minor" may be negative in tone, but we find that no jury would conclude that this is sufficient to reflect, or even contribute to, a breach of privilege.  The letter is, quite simply, a communication explaining a decision already duly taken by the PSCOA Executive Board, and any evidence of intent to harm is conspicuously absent.  We find that a fact-finder simply could not conclude that any breach of privilege was present.

Defendants continue by arguing that Plaintiff also cannot establish that any damages were sustained, as it is clear that PSCOA's members' contributions to CUSA have "hardly been consistent." (Doc. 21, p. 11). The Defendants cite to their Statement of Facts and evidence cited therein as support, which states that in February 2009, 479 PSCOA members were also contributing to CUSA, but in January 2010, CUSA membership in Pennsylvania had dropped to 313, even prior to the date of Defendant McNany's February 9, 2010  letter. (Doc. 22, ¶¶ 17 & 30).  Plaintiff admitted both of

these  Statement of Facts and, as such, they are undisputed.  (Doc. 24, ¶¶ 17 & 30).

Defendants' assert that the level of contribution to CUSA  by PSCOA members was always based on the members' individual decisions and that, even if they did contribute, their relationships with CUSA could be  terminated at will. (Doc. 21, p. 11). Defendants conclude this argument by stating that Plaintiff CUSA cannot prove that Defendants' actions caused it to suffer any damages due to "the rather fluid and unpredictable nature of membership." (*Id.*) (citing *International Travel Arrangers v. NWA, Inc.*, 991 F.2d 1389 (8th Cir. 1993)(mere general loss of possible unspecified air travel customers did not establish tort of intentional interference with prospective economic relations)). Again, we agree with Defendants that there is an absence of specific facts, with regard to damages, that could constitute a genuine issue needing resolution at trial. *Matsushita Electric Industry Co., Ltd. V. Zenith Radio Co., et al.,* 475 U.S. 574, 586 (1986).  We find that  Plaintiff CUSA has failed to sufficiently demonstrate that Defendants' actions caused it to suffer any damages.

2. *Tortious interference with an existing business relationship claim*

Proceeding to the second sub-argument, the Defendants assert in their brief that they have not improperly interfered with an existing business relationship of Plaintiff. (Doc. 21, p. 12). Defendants first lay out the elements of such a claim from *Fineman v. Armstrong World Indus, Inc.*, 980 F.2d 171, 186 (3d Cir. 1992), in which the Third Circuit held that a Plaintiff must prove that:

> 1) Plaintiff had a continuing or prospective economic relationship or reasonable expectation of economic advantage;
> 2) the defendant knew of such relationship or expectancy;
> 3) the interference and harm inflicted were done intentionally and with "malice" in the sense of conduct that is wrongful and without justification or excuse;
> 4) if not for the interference, it was reasonably probable that plaintiff would have realized its economic advantage; and

5) the plaintiff was injured as a result of defendant's conduct.

(Doc. 21, p. 12).

The Defendants argue that Plaintiff CUSA likewise cannot satisfy the tortious interference with an existing business relationship claim for much the same reasons that it cannot state a claim for interference with a contractual relationship. (*Id.*)

We again agree with the Defendants that, based on the undisputed evidence submitted, there is simply insufficient evidentiary support for Plaintiff's tortious interference with an existing business relationship claim.

First, we conclude that the evidence fails to show that Defendants acted with the "specific purpose" of harming Plaintiff CUSA or that the interference and harm were ever carried out intentionally. *See Phillips,* 959 A.2d at 429. Evaluating each of the Defendants' actions in turn, we find that when Defendant McNany sent out the letter dated February 9, 2010, to PSCOA members, he was not acting with the specific intent to harm CUSA, but, rather, he was fulfilling his responsibilities as the chief administrative and executive officer of PSCOA by notifying members of the Executive Board's decision to terminate its organizational membership with CUSA. *(See* Doc. 20,  Ex. 3, p. 4). Further, even assuming that the envelope addressed to "CORRECTIONS USA" was opened intentionally by Defendant Brezler and did contain CUSA checks and, that Brezler provided those checks to Defendant Miller to post on his Website, as we must assume in considering the evidence in a light most favorable to Plaintiff, we do not find that either Brezler or Miller acted intentionally to harm CUSA.  Instead, the evidence leads to the conclusion that Defendants Brezler and Miller performed these actions with the intent to harm, if anyone, Roy Pinto, the leader of the opposing slate of

31

candidates during an intense election campaign and simply another PSCOA official, not the CUSA organization.

Further, even if Defendants' conduct was specifically intended to harm Plaintiff CUSA, we find that their actions were proper under the circumstances because they fall within the "rules of the game." *See Phillips*, 959 A.2d at 430. Each of the actions at issue were committed for the purpose of protecting Defendants' "legitimate right[s] or interest[s]" that happened to conflict with those of Plaintiff CUSA. *Id.* Specifically, we find that the evidence reveals Defendant McNany sent his February 9, 2010, letter to protect the interest of PSCOA in maintaining a transparent leadership agenda with the dues-paying membership that elected him. In the letter, McNany did not attempt to persuade members to discontinue their memberships with CUSA. Rather, he notified them of the PSCOA Executive Board's decision, supplied them with the reasoning behind that decision (*i.e.*, "[W]e believe that CUSA's conduct was inconsistent with the goals and interests of our membership."), and provided them with information on how to terminate their individual memberships "if [they] do wish to terminate [their] contribution[s]."(Doc. 20, Ex. 11).

Similarly, we conclude that both Defendant Brezler's and Defendant Miller's respective actions regarding the providing and posting of CUSA checks on the Website were to protect their own interests in getting reelected as officers of PSCOA and, again, were not intended to harm CUSA specifically but to damage the reputation of an opposing candidate. We find all of these actions of Defendants were "proper" under appropriate standards of union leadership and politics. *See Phillips*, 959 A.2d at 430.

Lastly, the evidence presented fails to demonstrate that Plaintiff suffered any loss regarding membership and/or contributions as a result of Defendants' actions.[8]  The only evidence submitted to that effect was presented by Defendants, and it does little more than show that Plaintiff CUSA's membership in Pennsylvania was declining prior to the complained of conduct in question. (See Doc. 20, Ex. 2, ¶¶ 9, 18; Doc. 20, Ex. 7, ¶¶ 10, 15).[9] Thus, the evidence does not reveal that Plaintiff suffered any legal damage as a result of Defendants' actions.  Given that Plaintiff cannot meet the requisite evidentiary burden on several key elements of its tortious interference with an existing business relationship claim, Defendants' Motion for Summary Judgment must be granted with respect to this claim.

### 3. Tortious interference with prospective business/contractual relationships claim

Lastly, Defendants assert that they did not improperly interfere with prospective business relationships between Plaintiff and PSCOA members. (Doc. 21, p. 13). To satisfy this claim, the Defendants maintain that Plaintiff must prove the following elements outlined by the Court in *Thompson Coal Co. v. Pike Coal Co.*, 412 A.2d 466, 471 (1979): "1) a prospective contractual relation; 2) the purpose or intent to harm the plaintiff by preventing the relation from occurring; 3) the absence of privilege or justification on the part of defendant; and 4) the occasioning of actual damage resulting

---

[8] Neither party submitted evidence that reveals a drop in CUSA's membership or loss in contributions to CUSA *after* Defendants performed the actions at issue.

[9] Affidavits of Defendants McNany and Brezler submitted by Defendants aver that in February 2009, CUSA had 479 members in Pennsylvania, while in January 2010, CUSA membership in Pennsylvania had dropped to 313. Plaintiff did not dispute either of these averments and also did not show that membership continued to decline after Defendant McNany sent out his letter in February 2010 or after Defendant Miller posted CUSA checks on his Website later that year.

from the defendant's conduct." (Doc. 21, p. 13).

Defendants allege that a prospective contractual relation "'is something less than a contractual right, something more than a mere hope.'" (*Id.*)(citing *Santana Prods. v. Bobrick Washroom Equip., Inc.*, 401 F.3d 123, 140 (3d Cir. 2005), quoting *Thompson Coal*, 412 A.2d at 471)). Defendants contend that to prove a prospective contractual relation, Plaintiff must demonstrate an "objectively reasonable probability that a contract will come into existence." (Doc. 21, pp. 13-14) (citing *Schulman v. J.P. Morgan Inv. Mgt., Inc.,* 35 F.3d 799, 808 (3d Cir. 1994)).

The Defendants again assert that, for the same reasons thoroughly discussed above, Plaintiff cannot satisfy a claim for improper interference with prospective business relations and that, additionally, it is "rather clear" that the alleged relation constitutes the "'mere hope' category," especially because Plaintiff "made no attempt to reach out to prospective members by failing to attend Academy sessions." (Doc. 21, p. 14). Defendants cite to McNany's Affidavit as support. (Doc. 20, Ex. 2, ¶ 18). Pinto disputed this in his Affidavit. (Doc. 25, ¶ 18).

As mentioned above, it is not in dispute that Plaintiff CUSA and individual corrections officers in Pennsylvania had existing contractual relations. Regarding Plaintiff's alleged prospective contractual relations, we find, as Defendants contend, that these are based on nothing more than mere hope. Any contractual relation between CUSA and individual corrections officers may be terminated at any time by the corrections officers, absent any outside influence of PSCOA. (Doc. 21, p. 11). We also note that Defendant McNany did not even attempt to make PSCOA members' relationships with CUSA "more expensive or burdensome." *See Acumed*, 561 F.3d at 212 n.9 (quoting *Gemini Physical Therapy & Rehab., Inc. v. State Farm Mut. Auto. Ins. Co.*, 40 F.3d 63, 66 (3d Cir. 1994) ("[I]n

34

Pennsylvania, a party is not liable for tortious interference with prospective business relations for 'merely making a third party's performance of his contract with another party more expensive or burdensome.'")).

Defendants additionally assert that Pennsylvania individual membership with CUSA had always been "fluid and unpredictable," which, again, Plaintiff does not expressly dispute. (*Id.*). Furthermore, Plaintiff adduces no evidence which shows that any of Defendants' actions led to the drop in membership. Thus, under the undisputed evidence presented, we cannot conclude that any prospective contractual relations existed between Plaintiff CUSA and individual corrections officers in Pennsylvania.

Accordingly, based on the forgoing, we shall grant Defendants' Motion for Summary Judgment (Doc. 20) with respect to all of the claims in Plaintiff's Complaint.

An appropriate Order and Judgment follows.

**THOMAS M. BLEWITT**
**United States Magistrate Judge**

**Dated: August 31, 2012**

35